

## NUMBER 13-17-00281-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF K.R., A.R., G.L.C., CHILDREN

### On appeal from the County Court of Law No. 5
### of Nueces County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Contreras and Hinojosa
### Memorandum Opinion by Justice Contreras

Appellant C.S. challenges the trial court's order terminating her parental rights to her biological sons K.R., A.R., and G.L.C.[1] By six issues on appeal, C.S. contends that: (1) the trial court erred by not allowing her infant child to be present in the courtroom during trial; (2) the trial court erred by allowing the children's foster parents to intervene

---

[1] We refer to the children and their parents by their initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

as parties in the case; (3) her trial counsel provided ineffective assistance; (4) the jury selection process "did not result in a fair jury"; (5) the trial court erred by admitting hearsay testimony into evidence; and (6) her due process rights were violated because the jury verdict was not unanimous. We affirm.

## I. BACKGROUND

K.R. was born in July 2012, A.R. was born in July 2014, and G.L.C. was born in October 2015. Appellee, the Department of Family and Protective Services (the Department) filed a petition to terminate the parental rights of R.R. (K.R. and A.R.'s biological father), G.C. (G.L.C.'s biological father), and C.S. (the biological mother of all three children). In 2016, the children's foster parents filed a petition in intervention seeking sole managing conservatorship of the children.

At trial in March 2017, Department investigator Rey Rangel testified that C.S. tested positive for cocaine while she was pregnant with A.R. in 2014. He testified that the Department later received a report stating that C.S. and G.C. were using crack cocaine and methamphetamines in the presence of the children, that G.C. was a gang member and had weapons including assault rifles in the home, and that G.C. frequently slapped the children in the face. Rangel met with G.C., who admitted using drugs several days before and gave a positive drug test for methamphetamines. In September 2015, the Department received a report that G.C. was holding a woman captive inside the home where G.C. was caring for K.R. and A.R.[2] Further investigation revealed that the home had no food or electricity; there were bullet holes near a bedroom window; there were clothes, car parts, and cigarette butts strewn about; and the children were dirty and

---

[2] C.S. was incarcerated at the time.

2

wearing soiled diapers. K.R. and A.R. were removed and placed in foster care.

C.S. testified that, as far as she knew, G.C. was not involved in gang activity and did not use drugs while he was around the children. She knew that G.C.'s mother had made allegations of domestic abuse against him, but she stated she never saw G.C. slap the children and G.C. did not keep firearms in the home. According to C.S., R.R. has been incarcerated since July 2014 and is serving an eight-year prison sentence for assaulting her. C.S. believed that R.R.'s assault conviction had been enhanced due to prior domestic violence convictions. She stated that G.C., at the time of trial, was also incarcerated for domestic violence committed against her.

C.S. stated that she was convicted of state-jail felony theft when she was seventeen years old and was placed on probation. Her probation was revoked and she was incarcerated in state jail from July 2015 to January 2016. After being released, she agreed to the service plan instituted by the Department, which was adopted as an order of the court. The service plan required her to undergo urinalysis and hair follicle drug tests, but she did not always comply with the caseworker's requests that she take those tests. When asked why, C.S. testified: "I'm not going to do it. I have not done it because I don't feel that I should have to do it. I've never tested positive on any [urinalysis] and I think that you're just asking for hair follicle to make things difficult, honestly." C.S. further stated that she did not comply with the service plan's requirements that she complete a domestic violence class, a relapse prevention drug treatment course, or a psychosocial evaluation. She also frequently missed weekly scheduled visitations with the children. She did not know why she was not present at the hospital when K.R. had oral surgery, even though she admitted that she knew of the surgery "a few days before." C.S. testified

3

that she was arrested again in June 2016 on a misdemeanor charge of failure to identify and was incarcerated in county jail until August 2016.

The Department caseworker testified that K.R. and A.R. were placed in foster care in September 2015 and G.L.C. was placed in foster care immediately after he was born in October 2015. According to the caseworker, C.S. refused to take hair follicle drug tests because "she just didn't want to have her hair cut." C.S. completed individual counseling and a parenting class as required by the service plan, but the caseworker was concerned that C.S. continued to have contact with G.C. The caseworker testified that G.C. was arrested for assaulting C.S. on February 28, 2016, about a month after C.S. was released from state jail. The caseworker was also concerned that the man who lived with C.S. at the time of trial had a criminal history including multiple theft-related and drug-related arrests.

The therapist treating K.R. and A.R. testified that the children exhibit cognitive delays in the areas of language development and self-control, and she opined that the delays were caused by trauma. She stated that the children have progressed while in the custody of the foster parents and that they have expressed their desire to stay with the foster parents. The foster mother testified that she wants to adopt the children, and she stated that she would be willing to allow C.S. to visit the children if she was able to adopt.

The jury found that termination of C.S.'s parental rights was in the best interest of all three children and that C.S.: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being; (3) failed

4

to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who were in the Department's custody for not less than nine months as a result of removal for abuse or neglect; and (4) used a controlled substance in a manner that endangered the health or safety of K.R. and A.R. and either failed to complete a substance abuse treatment program or continued to use a controlled substance despite having completed such a program. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (P), (b)(2) (West, Westlaw through 2017 R.S.). The trial court rendered judgment in accordance with the verdict and this appeal followed.[3]

## II. DISCUSSION

### A. Exclusion of Child From Courtroom

In October 2016, C.S. gave birth to a fourth son, J.C.[4] The record reflects that, prior to the beginning of voir dire, the Department's counsel objected to the presence of the child, who was less than five months old at the time. The Department's counsel asked that the child "not be allowed to be at the courtroom during the pendency of this trial" because "it's unfairly prejudicial to the jury to see her running around the courthouse feeding and taking care of a baby when we're in the process of terminating her parental rights." C.S.'s counsel's opposed the motion. The trial court noted that "the courtroom isn't an appropriate place for a baby" and ruled that the child could remain in the courthouse but not in the courtroom.

On appeal, C.S. contends by her first issue that "[n]ot permitting the mother to care for her infant child during a termination of parental rights trial is highly prejudicial and

---

[3] The parental rights of R.R. and G.C. were also terminated. They are not parties to this appeal.

[4] C.S. testified that G.C. is J.C.'s father. Parental rights to J.C. were not at issue at trial.

5

probably left the fact finder with the impression that the infant child is not important to the mother." She cites only *In re J.D.S.*, in which it was held that "the presence, or nonpresence, of the parent in the courtroom at his or her termination hearing is vital to the fact-finder's decision to terminate a parent's rights to his or her child." 111 S.W.3d 324, 327 (Tex. App.—Texarkana 2003, no pet.) (holding that the trial court "should have weighed the relevant factors and had a reason for denying a bench warrant before it decided not to allow [the father] to participate in person" at a parental termination hearing).

We disagree that the trial court erred. A trial court's inherent power includes broad discretion over the conduct of its proceedings. *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 199 (Tex. Crim. App. 2003). This discretion includes its intervention to "maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time." *State v. Reina*, 218 S.W.3d 247, 255 (Tex. App.—Houston [14th Dist.] 2007, no pet.). We cannot conclude that the trial court abused its broad discretion in implicitly determining that the exclusion of a five-month-old infant from the courtroom was necessary to maintain control of the proceedings. C.S.'s first issue is overruled.

## B. Intervention By Foster Parents

By her second issue, C.S. argues that the trial court erred, violating her constitutional right to due process, by allowing the foster parents to intervene as parties in the case.

The Texas Family Code provides that:

the court may grant a grandparent or other person deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this subchapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional

6

development.

TEX. FAM. CODE ANN. § 102.004(b) (West, Westlaw through 2017 R.S.). C.S. does not dispute that the foster parents had "substantial past contact" with the children or that her appointment as a managing conservator would "significantly impair" the children's physical health or emotional development. *See id.* Instead, C.S. asserts that the foster parents' intervention "interject[ed] the issue of her fitness to parent the children into the suit concerning her fitness to retain her rights to them" and that it "caused an imbalance of power between her rights as a parent and the Department's power to terminate her parental rights." As "evidence" of this "imbalance," C.S. argues that the foster parents were able to publish "heart-warming" photos of them with the children, whereas C.S. "had no current pictures of the children to present to the jury because she had not been permitted to visit with the children in a meaningful way in a year and a half."[5]

We construe C.S.'s argument as contesting the constitutionality of section 102.004. In *In re A.B.*, the appellant made precisely the same argument to the Fort Worth Court of Appeals, to no avail. *See* 412 S.W.3d 588, 608–609 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014). The Fort Worth court held that the appellant parent's due process rights were not violated by the intervention of foster parents in a parental termination proceeding because appellant was represented by appointed counsel, the Department had the burden of proving grounds for termination by clear and convincing evidence, and the appellant did not point to "any evidence offered by the foster parents that [the Department] could not have offered had the foster parents not

---

[5] C.S. does not explain why she was unable to take pictures of herself with the children during the visits she attended.

intervened." 412 S.W.3d at 609 (citing *Rodarte v. Cox*, 828 S.W.2d 65, 79 (Tex. App.—Tyler 1991, writ denied)). The same is true in this case. We note additionally that, contrary to C.S.'s apparent belief, her "fitness to parent the children" is one of the key factors to be considered by the court when evaluating whether her parental rights should be terminated. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (setting forth factors to be considered in determining best interest of the child, including the parenting abilities of the parties seeking custody).

We conclude that C.S.'s due process rights were not violated by the intervention of the foster parents in the termination proceedings. C.S.'s second issue is overruled.

## C. Jury Selection

By part of her fourth issue on appeal, C.S. contends that the trial court abused its discretion by failing to strike two veniremembers for cause. She asserts that veniremembers number 11 and 13 "were conflicted in their beliefs as a potential juror on the case" and the trial court's failure to dismiss them "negatively impacted" her because veniremember number 13 "was seated as a juror and was highly prejudiced against [C.S.]."

To preserve error with respect to a trial court's failure to dismiss a veniremember for cause, an appellant must: (1) assert a clear and specific challenge for cause; (2) use a peremptory strike on the complained-of veniremember; (3) exhaust his peremptory strikes; (4) request additional peremptory strikes; (5) identify an objectionable juror; and (6) claim that he would have struck the objectionable juror with a peremptory strike if he had one to use. *Allen v. State*, 108 S.W.3d 281, 282 (Tex. Crim. App. 2003); *Andrus v. State*, 495 S.W.3d 300, 307 (Tex. App.—Beaumont 2016, no pet.); *see* TEX. R. APP. P.

8

33.1. Here, challenges for cause were asserted as to the complained-of veniremembers, but it is unclear from the record as to which attorney asserted those challenges. In any event, the record reflects that C.S.'s counsel did not request a peremptory strike on either veniremember 11 or veniremember 13, did not exhaust his peremptory strikes, and did not request additional peremptory strikes. Accordingly, this part of C.S.'s fourth issue has not been preserved for review, and we overrule it. *See Allen*, 108 S.W.3d at 282; *Andrus*, 495 S.W.3d at 307.

## D.    Admission of Evidence

By part of her fifth issue, C.S. contends that the trial court erred by admitting the Department's Exhibits 2 and 3 and certain hearsay statements into evidence. We review the trial court's rulings on the admission of evidence for abuse of discretion. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). We view the record in the light most favorable to the ruling and reverse it only if it is outside the zone of reasonable disagreement. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). Under the abuse of discretion standard, we must uphold the ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Amador*, 275 S.W.3d at 878–79; *Dixon*, 206 S.W.3d at 590.

Exhibits 2 and 3 are affidavits by Rangel supporting removal of the children. They stated in part that the Department had received reports that C.S. and G.C. were using crack cocaine and methamphetamines in the home in the presence of the children; that G.C. would slap the children and K.R. had a black eye; that G.C. was a known gang member and has AK-47s and other firearms in the home; and that both C.S. and G.C. had previously been charged and convicted of various crimes. When the Department's

9

counsel sought to introduce these affidavits into evidence at trial, C.S.'s counsel objected on grounds that: (1) they contained inadmissible hearsay; (2) their probative value was substantially outweighed by the danger of prejudice to C.S.; and (3) the criminal history information contained therein was not obtained from the Department of Public Safety but was rather obtained from the Nueces County website, which counsel stated "has not shown to be reliable." The trial court overruled the objections and admitted the affidavits into evidence.

On appeal, C.S. contends that the statement in the affidavit that she tested positive for cocaine while pregnant with A.R. was inadmissible hearsay because there was no evidence as to the testing procedure nor were there any other indicia of reliability. *See* TEX. R. EVID. 803(6) (providing an exception to the rule against hearsay for records of a regularly conducted activity); *In re K.C.P.*, 142 S.W.3d 574, 579–80 (Tex. App.—Texarkana 2004, no pet.) (noting that, for drug test results to be admissible under an exception to the hearsay rule, it must be shown that the results were "properly preserved or generated" and "produced by the use of proper procedures and methods"). She also claims by this part of her fifth issue that the trial court erred by denying her objection to Exhibits 2 and 3 on Rule 403 grounds. *See* TEX. R. EVID. 403 (providing that a trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of, among other things unfair prejudice).

The Department contends that the hearsay issue has not been preserved because counsel did not specify which parts of the affidavits were inadmissible. *See Speier v. Webster Coll.*, 616 S.W.2d 617, 619 (Tex. 1981) ("A general objection to a unit of evidence as a whole, . . . which does not point out specifically the portion objected to, is

properly overruled if any part of it is admissible."); *see also L.M. v. Dep't of Family & Protective Servs.*, No. 01-11-00137-CV, 2012 WL 2923132, at \*5 (Tex. App.—Houston [1st Dist.] July 12, 2012, pet. denied) (mem. op.) ("A blanket hearsay objection that does not identify which parts of a document contain hearsay is not sufficiently specific to preserve error with respect to those parts."); TEX. R. APP. P. 33.1.

Assuming but not deciding that the issue was properly preserved and the trial court erred in admitting the exhibits, we find no reversible error because the same or similar evidence was admitted without objection at other points in the trial. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) ("[E]rror in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection."). In particular, Rangel testified without objection at trial that he reviewed a report alleging that C.S. had tested positive for cocaine while she was pregnant with A.R.; that C.S. had admitted using cocaine in January 2014 but then discontinued her use; and that during his investigation, there was "an incident of domestic violence" between C.S. and R.R. which resulted in R.R. being arrested. Rangel also testified, without objection, as to the allegations that C.S. and G.C. were using crack cocaine and methamphetamines, and that G.C. was a gang member, had weapons including an AK-47 in the home, and frequently slapped the children. C.S. herself testified that she used cocaine before finding out she was pregnant with A.R., and that she tested positive for cocaine at her first doctor's appointment after learning she was pregnant.

C.S. additionally argues by this part of her fifth issue that the trial court erred in admitting Rangel's testimony, over her counsel's objection, regarding another report

11

submitted to the Department which stated in part that "there had been an incident of domestic violence between [C.S.] and [G.C.]," that both C.S. and G.C. were "avid crack cocaine users," and that "the drugs were used while caring for the children."  But again, even if the trial court erred in overruling the objection, the error is not reversible because the same or similar evidence was admitted elsewhere without objection.  *See id.* Specifically, Rangel previously testified without objection about a report alleging that C.S. and G.C. were using crack cocaine and methamphetamines, and C.S. herself testified that there was domestic violence in her relationship with G.C.

We overrule this part of C.S.'s fifth issue.

### E.    Ineffective Assistance of Counsel

By her third issue and parts of her fourth and fifth issues, C.S. contends that her appointed trial counsel provided ineffective assistance.

In a suit filed by a governmental entity seeking termination of parental rights, indigent parents who respond in opposition to the termination are entitled to the appointment of counsel to represent their interests.  TEX. FAM. CODE ANN. § 107.013(a)(1) (West, Westlaw through 2017 R.S.).  This statutory right to the appointment of counsel necessarily embodies the right to effective assistance of counsel at every critical stage of the proceeding.  *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003).  To establish ineffective assistance, the movant must show:  (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the appellant.  *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)).  As to the first prong,

> counsel's performance falls below acceptable levels of performance when the representation is so grossly deficient as to render proceedings fundamentally unfair.  In this process, we must give great deference to counsel's performance, indulging a strong presumption that counsel's

12

conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. It is only when the conduct was so outrageous that no competent attorney would have engaged in it, that the challenged conduct will constitute ineffective assistance.

*Id.* at 545 (footnotes and internal quotations omitted). As to the second prong, the appellant must establish that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 550. The appellant must show that counsel's errors were so serious as to deprive the appellant of a fair trial. *Id.* at 545. Ineffective assistance claims must be firmly founded in the record, and the record must affirmatively show the alleged ineffectiveness. *In re L.C.W.*, 411 S.W.3d 116, 127 (Tex. App.—El Paso 2013, no pet.).

C.S. first contends that her trial counsel was ineffective because he failed to object to the Department's requests to strike four specific veniremembers for cause.[6] C.S. argues that these veniremembers would have been "ideal" jurors for her and she claims that, had her trial counsel objected to the strikes for cause, the trial court would have disallowed them. However, trial counsel's failure to object to a challenge for cause may be a strategic and tactical decision. *Hebert v. State*, 489 S.W.3d 15, 23 (Tex. App.— Houston [14th Dist.] 2016, no pet.). Here, there is nothing in the record explaining why counsel declined to object to these challenges. As noted by the Department on appeal, counsel may have strategically declined to object to the strikes because of his observations of the veniremembers' demeanor, or because any such objections would

---

[6] Veniremember number 3 stated that he would find it "very difficult," but not impossible, for him to terminate parental rights; veniremember number 14 stated that she did not believe the government should interfere with parental rights; veniremember 16 stated that he would "have a really hard time" sitting in judgment of people and would not terminate solely because a parent used drugs; and veniremember 19 stated that it would be very hard but not impossible for her to terminate parental rights and that she would not terminate merely because the parent used drugs.

13

have been futile due to the veniremembers' apparent partiality, thereby diminishing his credibility with the trial court. On this record, we cannot say that counsel was ineffective for failing to object to the strikes for cause.

Next, C.S. contends that counsel was ineffective by failing to exercise a peremptory strike against veniremember number 13, who eventually served on the jury. C.S. claims that this juror was "clearly biased against drug use" and was "highly prejudiced" against her. She does not, however, direct us to any point in the voir dire record where such prejudice or bias is evidenced. Accordingly, this contention is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

C.S.'s remaining ineffective assistance complaints involve trial counsel's approach to the admission of alleged hearsay evidence. She complains of counsel's failure to file a pre-trial motion in limine which, if granted, would have made a hearing necessary before hearsay was admitted; of counsel's "course of conduct" of failing to object to hearsay, particularly during Rangel's testimony; of counsel's failure to object to the Department's Exhibit 22, which consisted of police records; and of counsel's failure to move to strike alleged hearsay after objections were sustained. The record does not reveal any reasons for counsel's failure to perform in the manner suggested by C.S. Nevertheless, we conclude that these inactions were not "so outrageous that no competent attorney would have engaged in it." *See In re M.S.*, 115 S.W.3d at 545. Instead, there are potential strategic reasons for these inactions; for example, counsel may have declined to object to the admission of hearsay if he believed such an objection would be overruled, and he may have declined to request that hearsay be stricken from the record because such a request would draw the jury's attention to the evidence.

14

"We may not speculate to find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Here, in the absence of evidence as to any strategic reasons for counsel's behavior, we conclude that C.S. has not overcome the strong presumption that counsel's conduct fell "within the wide range of reasonable professional assistance." *In re M.S.*, 115 S.W.3d at 545.

C.S.'s issues regarding ineffective assistance of counsel are overruled.

## F.    Unanimous Verdict

Finally, by her sixth issue on appeal, C.S. complains that her right to due process under the Fourteenth Amendment to the United States Constitution was violated because the termination of her parental rights was based upon a non-unanimous jury verdict. She notes that the termination of parental rights "involves fundamental constitutional rights" and she argues without reference to authority that, though judgments may generally be rendered upon non-unanimous verdicts in civil cases, "[u]nanimity should be required" in termination proceedings "because a termination case is more like a criminal case than a civil one."

The record reflects that the jury's verdict in this case was, in fact, unanimous. Accordingly, we overrule C.S.'s sixth issue as moot. *See Nat'l Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999) ("Appellate courts are prohibited from deciding moot controversies.").

15

### III. Conclusion

The trial court's judgment is affirmed.

DORI CONTRERAS
Justice

Delivered and filed the
26th day of October, 2017.